BARRY W. RASHKOVER (BR-6413)
ASSOCIATE REGIONAL DIRECTOR

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
233 Broadway
New York, N.Y. 10279
(646) 428-1856

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 22 2004 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

   -against-

LLOYD SILVERSTEIN,

            Defendant.
------------------------------------------------------------X

CV 04 255

04 Civ. ____ ( )

COMPLAINT

ASSER, J.

AZRACK, J.

    Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant Lloyd Silverstein ("Silverstein") alleges as follows:

### PRELIMINARY STATEMENT

    1.    While serving as an executive at Computer Associates International, Inc. ("CA"), defendant Silverstein participated in a widespread practice that resulted in the improper recognition of revenue by CA, one of the world's largest software companies. During at least CA's fiscal year 2000, which ran from April 1, 1999 through March 31, 2000 ("FY2000"), CA prematurely recognized revenue from software contracts that had not yet been consummated, in violation of Generally Accepted Accounting Principles ("GAAP"). Through the conduct of certain members of CA management, including Silverstein, CA engaged in a practice in which CA held its books open after the end of each quarter and improperly recorded, in that elapsed

quarter, revenue from contracts that had not been finalized and executed before the expiration of the quarter. CA personnel sometimes concealed this practice by using licensing contracts that falsely bore preprinted signature dates for the last day of the quarter that had just expired, rather than the subsequent dates on which the contracts actually were executed.

2. As a result of this improper practice, CA made material misrepresentations and omissions about its revenue and earnings in Commission filings and other public statements for at least FY2000. For the Second, Third and Fourth Quarters of FY2000, respectively, at least 33%, 26% and 5.5% of CA's reported quarterly revenues pertained to contracts not executed by CA or the clients by the quarter's end. For all quarters of FY2000 combined, CA prematurely recognized over $1 billion in revenue from at least 95 contracts that the client or CA signed after the quarter close. CA's FY2000 reported revenues and earnings per share appeared to meet or exceed the consensus estimates of Wall Street analysts, but CA failed to disclose that those reported results improperly included prematurely recognized revenue and did not comply with GAAP. When CA refrained from recognizing revenue prematurely during the First Quarter of FY2001, the company missed its earnings estimate and CA's stock price dropped over 43% in a single day.

3. Silverstein facilitated CA's accounting fraud by, among other things, (1) advising CA's sales force of the number of days CA's management and Finance Department had decided to "extend" a particular fiscal quarter; (2) knowing or recklessly disregarding the fact that CA personnel were backdating contracts to conceal their true execution dates; (3) participating in the process of negotiating contracts after quarter's end while knowing or recklessly disregarding the fact that CA would record revenue from those contracts in the quarter that had just elapsed; (4) knowing or recklessly disregarding the fact that the purpose of extending fiscal quarters and

2

backdating contracts was improperly to report in prior fiscal quarters revenue from contracts that were not executed and finalized until after those fiscal quarters elapsed, and knowing or recklessly disregarding the fact that such practices were improper under GAAP; (5) allowing personnel to forward false and misleading contracts and paperwork to CA's Finance Department for accounting purposes; and (6) advising CA's sales force about revenue recognition rules while he knew or should have known that GAAP required that both CA and the customer execute a software contract before CA could recognize revenue from that contract.

## VIOLATIONS

4. By virtue of the conduct alleged in this Complaint: Silverstein, directly or indirectly, singly or in concert, has engaged in acts, practices and courses of business that constitute violations of Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(b)(5); and Rules 10b-5 and 13b2-1, 17 C.F.R. §§ 240.10b-5 and 240.13b2-1; and Silverstein, pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), is also liable for aiding and abetting CA's violations of Sections 10(b), 13(a) and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1 and 13a-13, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13, thereunder.

5. Unless Silverstein is permanently restrained and enjoined by this Court, he will again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object. By this action, the Commission seeks judgment, among other things: (a) permanently enjoining Defendant from engaging in the acts, practices and courses of business alleged herein, pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. §78u(d); (b) requiring the Defendant to disgorge any and all ill-gotten gains

3

together with prejudgment interest; (c) requiring the Defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); and (d) barring Silverstein from serving as an officer or director of a publicly held company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to the authority conferred upon it by Section 21 of the Exchange Act, 15 U.S.C. § 78u, seeking to restrain and enjoin permanently the Defendant from engaging in the acts, practices, and courses of business alleged herein, and seeking civil penalties and other relief.

7. The Defendant, directly and indirectly, has used the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

8. Certain of these transactions, acts, practices and courses of business occurred in the Eastern District of New York, including conduct by Silverstein while at CA's corporate headquarters in Islandia, New York.

9. Accordingly, this Court has jurisdiction over this action, and venue is proper in this district, pursuant to Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa.

## DEFENDANT

10. **Silverstein**, age 48, resides in Dix Hills, New York. From approximately 1998 through 2003, Silverstein worked for CA as a Divisional Senior Vice President heading CA's Global Sales Operations ("GSO"), a department that acted as a liaison among the Finance, Legal and Sales Departments. He first joined CA in 1988 and worked in the General Accounting Department for approximately five years. He then moved to the Sales Accounting Department,

where he worked until in our about the fall of 1997 when he began to work in the North American Sales operation at CA. For approximately six months in 1997, he headed the Sales Accounting Department, and then became the head of GSO. At the request of CA, Silverstein tendered his resignation on or about October 8, 2003. Silverstein holds a professional license as a Certified Public Accountant, though the license is inactive.

## OTHER RELEVANT PERSON

11. CA is a Delaware corporation headquartered in Islandia, New York. CA licenses software for computer mainframes and client server systems. According to CA's Form 10-K Annual Report for the fiscal year ended March 31, 2003 ("2003 10-K"), CA "design[s], market[s], and license[s] computer software products that allow businesses to run and manage critical aspects of their information technology operations and that allow data center managers and programmers to automate their daily functions." CA is one of the largest computer software companies in the world; according to its 2003 10-K, more than 95% of the Fortune 500® companies use its software products. CA's common stock trades on the New York Stock Exchange and is registered pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. §78l(b). Computer Associates' fiscal year concludes at the end of each March. Many of the events alleged in this complaint took place during CA's FY2000, which ran from April 1, 1999 through March 31, 2000.

## DEFENDANT'S ROLE IN CA'S ACCONTING FRAUD

12. By FY2000, a widespread practice had developed at CA that allowed for the premature recognition of revenue from software licensing agreements. Pursuant to this practice, referred to in this Complaint as the "Extended Quarters practice," CA personnel recorded, into the just-elapsed fiscal quarter, revenue from software contracts that were not finalized and signed

5

until days or weeks after that quarter ended. Reporting revenue in this fashion was improper because it violated GAAP, which required that license agreements be fully executed and final before recognizing revenue. CA's reported revenue and earnings per share appeared to meet or exceed Wall Street analysts' expectations, when – in truth and fact – those results were built in part on revenue that CA recognized prematurely and in violation of GAAP. In FY2000, Silverstein, as the head of CA's GSO Department, helped CA engage in these improper revenue recognition practices.

13. In 2003, CA announced that the Audit Committee of its Board of Directors was conducting an inquiry into the timing of revenue recognition at the company. In a press release dated October 8, 2003, CA announced what it described as "preliminary results" of that inquiry. Quoting Walter P. Schuetze, the chair of the Audit Committee, that press release stated, among other things, that:

> "The Audit Committee's investigation is continuing, but we have determined that CA recognized certain revenue prematurely in the fiscal year ending March 31, 2000. The committee found that a number of software contracts in that fiscal year appear to have been signed after the end of the quarter in which revenues associated with such contracts had been recognized. Those revenues should have been recognized in the quarter in which the contract was signed."

In that same press release, CA announced that CA had asked for and received the resignations of those who, according to CA, "oversaw sales accounting during the relevant time" including, among others, Silverstein.

## Improper Revenue Recognition at CA

14. During the time period relevant to this Complaint, including but not limited to FY2000, CA derived its income primarily from licensing software and providing maintenance

for that software. CA's software has operated and maintained powerful "mainframe" computers, those generally used by businesses and other organizations. Prior to October 2000, CA's contract and licensing model involved entering into long-term licensing contracts, some as long as seven years in duration. Under that business model, customers paid an initial licensing fee for the software, plus subsequent licensing fees for the right to use the software in subsequent years. In addition, customers paid CA for ongoing maintenance such as technical support. Customers often entered into long-term contracts and spread out the licensing and maintenance fees over the term of the contract.

15. For contracts under its pre-October 2000 business model, GAAP allowed CA to recognize all the license revenue called for during the duration of the contract up front, during the fiscal quarter in which the software was shipped and the contract was executed and final. SOP 97-2, which the American Institute of Certified Public Accountants adopted in October 1997, requires the following before revenue can be recognized from a software sale:

- evidence of an arrangement;
- delivery;
- fixed and determinable fees; and
- ability to collect.

Where a company uses contracts requiring signatures by the licensor and licensee, then SOP 97-2 says that both signatures – the licensor and the customer – are required as "evidence of an arrangement" before the company may recognize revenue. During the period relevant to this Complaint, including but not limited to CA's FY2000, all of CA's license agreements required signatures by both CA and the customer.

16. During at least FY2000, CA violated GAAP, including SOP 97-2, by recording into

7

fiscal quarters that had expired software contracts that were not executed – and for which "evidence of an arrangement" did not exist – until a subsequent quarter. This Extended Quarters practice resulted in CA's premature recognition of revenue. As a consequence, CA made material misrepresentations and omissions of fact concerning CA's revenues and earnings for FY2000 in various public documents and in connection with the purchase and sale of securities. CA's reported results for FY2000 appeared to meet or exceed the revenue and earnings estimates of outside analysts when, in fact, those reported results did not comply with GAAP and were false and misleading.

17. Specifically, CA made the following misrepresentations and omissions about its revenue and earnings per share.

    a. **Second Quarter FY2000.** In its Form 10-Q quarterly report for the Second Quarter of FY2000 (quarter ended September 30, 1999) and in a press release dated October 19, 1999, CA represented that its total revenue for the quarter amounted to approximately $1.605 billion. In that Form 10-Q, CA represented that its earnings per share totaled $0.60 per share (diluted basis). In its press release dated October 19, 1999, CA also announced earnings per share of $0.60 (diluted basis) but also represented that its "[s]econd quarter operating earnings per share (diluted) excluding acquisition related amortization charges, was $[0].75, [per share] compared to $[0].58 a year ago, an increase of 29%." Analysts surveyed by First Call estimated, on average, that CA would achieve $0.59 per share earnings for its Second Quarter of FY2000. CA's reported and announced revenue and earnings per share results were false and misleading. CA recorded as revenue for the Second Quarter of FY2000 several contracts that CA's customers executed after September 30, 1999. The GAAP value of these contracts totaled at least $450 million. Additionally, CA executed, well after the Second Quarter of FY2000, several other

8

contracts, with a GAAP value totaling at least $80 million. Thus, CA improperly recorded at least $530 million of GAAP revenue in the Second Quarter of FY2000, representing at least 33% of all reported gross revenue for that quarter. Because CA prematurely recorded revenue into the Second Quarter of FY2000, its reported earnings per share also were false. CA omitted to disclose, in its contemporaneous Commission filings and press releases including but not limited to its Form 10-Q for the Second Quarter of FY2000 and October 19, 1999 press release, that its reported quarterly revenue was inconsistent with GAAP and included revenue that was not appropriately recorded in the Second Quarter of FY2000.

      b.     **Third Quarter FY2000.** CA also improperly recognized revenue from late-signed contracts in the Third Quarter of FY2000. In its Form 10-Q quarterly report for the Third Quarter of FY2000 (quarter ended December 31, 1999) and in a press release dated January 26, 2000, CA represented that its total revenue for the quarter amounted to approximately $1.81 billion. In its Form 10-Q for that quarter, CA represented that its earnings per share amounted to $0.72 (on a diluted basis). In its press release dated January 26, 2000, CA represented that its "[t]hird quarter operating earnings per share (diluted) was $[0].91, compared to $[0].71 a year ago, an increase of 28%, excluding acquisition related amortization charges and a one time non-cash asset write-down of $37 million." Analysts surveyed by First Call estimated, on average, that CA would achieve $0.90 per share earnings for its Third Quarter of FY2000. CA's reported and announced revenue and earnings per share results were false and misleading. CA recorded as revenue for the Third Quarter of FY2000 contracts that both CA and the customers executed after the end of December 1999. The GAAP value of these contracts totaled approximately $350 million. CA also recorded, as revenue for the Third Quarter of FY2000, at least approximately $130 million in GAAP revenue from contracts CA executed after the Third Quarter of FY2000.

9

Thus, CA improperly recorded at least approximately $480 million of GAAP revenue in its Third Quarter of FY2000, representing at least 26% of CA's reported gross revenue for that quarter. Because CA prematurely recorded revenue into the Third Quarter of FY2000, its reported earnings per share also were false. CA omitted to disclose, in its contemporaneous Commission filings and press releases including but not limited to its Form 10-Q for the Third Quarter of FY2000 and January 26, 2000 press release, that its reported quarterly revenue was inconsistent with GAAP and included revenue that was not appropriately recorded in the Third Quarter of FY2000.

    c.    **Fourth Quarter FY2000.** CA also improperly recognized revenue in the Fourth Quarter of FY2000 (quarter ended March 31, 2000). In its Form 10-K Annual Report for FY2000, and in a press release dated May 15, 2000, CA represented that its total revenue for the Fourth Quarter of FY2000 amounted to $2.127 billion. In that Form 10-K Annual Report, CA represented that earnings per share for the Fourth Quarter of FY2000 amounted to $0.70 (diluted basis). In a press release dated May 11, 2000, CA stated "it expects financial results for the fourth quarter ending March 31, 2000 to be in line with consensus estimates." In its press release dated May 15, 2000, CA represented that, for the Fourth Quarter of FY2000, "[o]perating earnings per share (diluted) increased 26% to $1.13 from last year's $.90, excluding the Sterling acquisition charge, other acquisition amortization charges and the one time non-cash charge." CA's reported revenue and announced earnings per share results were false and misleading. CA recorded as revenue for the Fourth Quarter of FY2000 several contracts that actually were executed by CA and the customers after the end of March 2000. The GAAP value of these contracts totaled approximately $120 million. Thus, CA improperly recognized as revenue over about $120 million of GAAP revenue in the Fourth Quarter of FY2000, representing at least

5.5% of all reported gross revenue for that quarter. Because CA prematurely recorded revenue into the Fourth Quarter of FY2000, its reported earnings per share also were false. CA omitted to disclose, in its contemporaneous Commission filings and press releases including but not limited to its Form 10-K for FY2000 and May 15, 2000 press release, that its reported quarterly revenue was inconsistent with GAAP and included revenue that was not appropriately recorded in the Fourth Quarter of FY2000.

    d.    **Year End FY2000.** CA's Form 10-K for FY2000 was inaccurate and misleading also in that it (a) repeated false statements about CA's quarterly results as reported in the Form 10-Qs for the Second and Third Quarters, as set forth in paragraph 17(a) through (b) above; (b) contained false statements about the company's annual revenue and earnings results; and (c) failed to disclose the Extended Quarters practice. CA also misstated the company's annual earnings per share in its Form 10-K Annual Report for FY2000. The $120 million in contract revenue referenced in paragraph 17(c) above was not only improper revenue for the Fourth Quarter of FY2000, but also for FY2000 as a whole: By reporting that CA's revenue for FY2000 was $6.103 billion, CA's Form 10-K for FY2000 was false and misleading. Because CA prematurely recorded revenue into the FY2000, its reported earnings per share for FY2000 also were false.

    18.    The premature recognition of revenue at CA during at least FY2000 was the result of a systemic, intentional practice by certain CA personnel. To implement and conceal this Extended Quarters practice, CA personnel employed a variety of improper techniques, many of which rendered the company's books and records false and misleading. Indicia of this are:

    a.    Some employees at CA called the Extended Quarters practice the "35-day month" practice, because generally most quarters were extended by at least 3 business days, although

some quarterly extensions lasted longer.

    b.    Sometimes, CA had its customers execute contracts bearing pre-printed dates from the just expired quarter even though the customer did not actually sign the contract until days or weeks into the new quarter.

    c.    Other times, even when the customer signed the contract before quarter end, CA did not execute the contract until the following quarter.

    19.    CA did not prematurely record revenue for software contracts during the First Quarter of FY2001 (quarter ended June 30, 2000). That quarter, CA missed its quarterly earnings estimates. CA issued a press release on July 3, 2000 stating that it would miss the analysts' estimates, specifically citing the fact that the company did not complete several large contracts that they had hoped to conclude before the close of the quarter. This was only the second time in CA's then recent history that CA missed Wall Street's estimates. The next trading day, July 5, 2000, CA's stock dropped over 43% from $51.12 to $28.50 as the market reacted to the news. Subsequent days of trading brought negligible gains.

**Silverstein's Misconduct**

    20.    During the period relevant to this Complaint, including but not limited to FY2000, Silverstein headed CA's GSO department. During that period, GSO had about a dozen employees, called Business Managers, who worked on almost all of CA's larger deals. The GSO assisted CA's sales force in the negotiation of license agreements by reviewing the terms and conditions of those agreements to ensure, among other things, that the revenue from these agreements was permitted to be recognized for accounting purposes. Prior to finalizing most major deals, CA required the sales force to obtain GSO's approval, along with approval by the Finance and Legal Departments. Because it operated at the intersection of Sales, Legal and

Finance, GSO was closely and regularly involved in CA's Extended Quarters practice.

21. By overseeing CA's GSO Department, Silverstein helped to cause CA to improperly recognize revenue during at least April 1999 through at least April 2000. Specifically, Silverstein facilitated CA's fraudulent conduct by, among other things, (1) advising CA's sales force of the number of days CA's management and Finance Department had decided to "extend" a particular fiscal quarter; (2) knowing or recklessly disregarding the fact that CA personnel were backdating contracts to conceal their true execution dates; (3) participating in the process of negotiating contracts after quarter's end while knowing or recklessly disregarding the fact that CA would record revenue from those contracts in the quarter that had just elapsed; (4) knowing or recklessly disregarding the fact that the practice of extending fiscal quarters and backdating contracts was improperly to report in prior fiscal quarters revenue from contracts that were not executed and finalized until after those fiscal quarters elapsed, and knowing or recklessly disregarding the fact that such practices were improper under GAAP; (5) allowing personnel to forward false and misleading contracts and paperwork to CA's Finance Department for accounting purposes; and (6) advising CA's sales force about revenue recognition rules while he knew or should have known that GAAP required that both CA and the customer execute a software contract before CA could recognize revenue from that contract.

22. Silverstein frequently notified personnel at CA about extended quarters. When CA's salesmen and sales executives needed – for any particular quarter – to know exactly when CA was closing the books, they typically contacted Silverstein. Silverstein advised sales personnel as to the exact number of "additional" days each quarter would have for purposes of accounting for software contracts. Silverstein knew, or acted in reckless disregard of the fact, that the purpose of extending quarters was to allow CA to record revenue from contracts executed and

finalized after the quarter's end.

23. Silverstein himself was consulted about the terms and conditions of contracts that were negotiated during the extended periods and thus knew that negotiations and executions were occurring into the new quarter. For these contracts, he knew or acted in reckless disregard of the fact that revenue from those contracts would be recorded the quarter that had just expired. For example, during January 2000, Silverstein was involved in finalizing a contract that ultimately was recorded in the quarter ending December 31, 1999. Similarly, in October 1999, Silverstein gave comments on a contract that CA ultimately recorded for the fiscal quarter ending September 30, 1999. In each case, Silverstein knew, or recklessly disregarded the fact that revenue from the contracts in question would be recorded for the quarter that had just elapsed.

24. At times, Silverstein explicitly or tacitly approved recording specific contracts as finalized in a just-elapsed quarter even though he knew, or recklessly disregarded the fact, that the contracts in question had not been fully executed in that elapsed quarter. In addition, Silverstein often called sales managers after a quarter ended to check on the status of contracts and instruct the sales managers to close those deals for the just ended quarter. Silverstein and other senior managers asked personnel in GSO if deals had closed and pressured them to close contracts for the just ended quarter.

25. Silverstein received or sent emails evidencing that he knew, or was reckless in not knowing, that CA was negotiating other contracts after the end of the quarter. Some emails alerted Silverstein that the sales force was negotiating a contract after the end of a quarter. Some emails informed him about the backdating of contracts. Despite this, there is no record that he took any action to stop CA from recording contract revenue in incorrect quarters. Instead, he allowed his GSO staff to approve contract cover forms that indicated that CA was going to book

14

the contract in the prior month on CA's accounting books and records.

26. Silverstein routinely instructed sales managers on revenue recognition issues. Silverstein knew that GAAP and SOP 97-2 required CA's contracts to have been signed both by the customer and CA before revenue could be recognized.

### Silverstein's Obstruction of the Commission's Investigation

27. In September 2002, counsel to CA brought Silverstein to a joint proffer interview conducted by the Commission staff and members of the Justice Department to answer questions regarding CA's trial agreements. Prior to the interview, other individuals at CA instructed Silverstein not to disclose the Extended Quarters practice. At the proffer session, Silverstein (a) made intentional misstatements, and (b) failed to disclose information he knew to be relevant to the government's investigation. For example, Silverstein falsely stated, in words or substance, that the purpose of the "three-day window" was to provide a period of time after the end of fiscal quarters in which license agreements that were properly signed before the end of the quarters could be administratively processed. Silverstein intentionally did not disclose during the proffer interview that the true purpose of the "three-day window" was to provide a period of time after the end of fiscal quarters during which license agreements could be finalized and signed, then backdated to make it appear as though they had been finalized and signed within the quarters, so that revenues associated with the licenses could be falsely booked in the incorrect quarters.

## FIRST CLAIM FOR RELIEF

### Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder

28. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 27.

29. Silverstein, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of CA securities, knowingly or recklessly, has: (a) employed, is employing or about to employ, devices, schemes and artifices to defraud; (b) made, is making or is about to make untrue statements of material fact, or has omitted, is omitting, or is about to omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged, is engaging and is about to engage in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of CA securities and upon other persons, including in CA's Commission filings for FY2000 including the Form 10-K and Forms 10-Q for the Second and Third Fiscal Quarter and in other public statements.

30. By reason of the foregoing, Silverstein, singly or in concert, directly or indirectly, has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## SECOND CLAIM FOR RELIEF

**Violations of Section 13(b)(5) of
The Exchange Act, 15 U.S.C. § 78m(b)(5),
and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, thereunder**

31. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 27.

32. Exchange Act Section 13(b)(5) states that no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in Exchange Act Section 13(b)(2). Exchange Act Rule 13b2-1 prohibits any person from directly or indirectly, falsifying or causing to be falsified, an issuer's books and records.

33. By reason of the foregoing, Silverstein has violated, and unless enjoined, will again violate Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and Rule 13b2-1, 17 C.F.R. § 240.13b2-1, thereunder.

## THIRD CLAIM FOR RELIEF

**Aiding and Abetting Liability for CA's
Violations of Sections 10(b), 13(a), 13(b)(2)(A),
and 13(b)(2)(B) of the Exchange Act,
15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A)
and 78m(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1,
and 13a-13, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1,
and 240.13a-13, thereunder**

34. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 27.

35. CA, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of CA securities, knowingly or

recklessly, has: (a) employed, is employing or about to employ, devices, schemes and artifices to defraud; (b) made, is making or is about to make untrue statements of material fact, or has omitted, is omitting, or is about to omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged, is engaging and is about to engage in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of CA securities and upon other persons. CA made untrue statements of material fact in, among other things, Commission filings for FY2000 including the Form 10-K and Forms 10-Q for the Second and Third Fiscal Quarter and in other public statements.

36. By reason of the foregoing, CA, singly or in concert, directly or indirectly, has violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

37. Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 thereunder require issuers of registered securities to file with the Commission factually accurate annual and quarterly reports. Exchange Act Rule 12b-20 provides that in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading. By reason of the foregoing, CA violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13, thereunder.

38. Section 13(b)(2)(A) of the Exchange Act requires that issuers make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer.

39. Section 13(b)(2)(B) of the Exchange Act requires, among other things, that issuers maintain a system of internal accounting controls that permit the preparation of financial statements in conformity with GAAP. By reason of the foregoing, CA has violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B). Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Silverstein aided and abetted CA's violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B), and Rules 10b-5, 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13, and unless enjoined, will again violate these provisions of the Exchange Act and Rules thereunder. Silverstein knowingly provided substantial assistance to CA by, among other things, engaging in the conduct alleged in paragraphs 1 to 27 above.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Silverstein and his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from (a) future violations of Sections 10(b) and 13(b)(5) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(b)(5), and Rules 10b-5 and 13b2-1, 17 C.F.R. §§ 240.10b-5 and 240.13b2-1; and (b) aiding and abetting any issuers' future violation of Sections 10(b), 13(a), and 13(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), and 78m(b), and Rules 10b-5, 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13.

## II.

Ordering Silverstein to disgorge any and all the ill-gotten gains he received as a result of his violations of the federal securities laws, and to pay prejudgment interest on all such gains.

## III.

Ordering Silverstein to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## IV.

Permanently barring Silverstein from serving as an officer or director of a publicly held company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

## V.

Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
January 22, 2004

_____
Barry W. Rashkover (BW-6413)
Associate Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
233 Broadway
New York, New York 10279
(646) 428-1856

**Of Counsel:**
Edwin H. Nordlinger
Alexander M. Vasilescu
William J. Estes